Jean-Marc Zimmerman
Zimmerman, Levi & Korsinsky LLP
226 St. Paul Street
Westfield, NJ 07090
Tel: (908) 654-8000
Fax: (908) 654-7207

John W. Hathaway
Law Offices John W. Hathaway, PLLC
4600 Bank of America Tower
701 Fifth Avenue
Seattle, WA 98104
Tel: (206) 624-7100
Fax: (206) 624-9292

Attorneys for Plaintiff Eon-Net, L.P.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EON-NET, L.P.,

                        Plaintiff,

            v.

FLAGSTAR BANCORP, INC.,

                        Defendant.

CASE NO. C05-2129 MJP

**DECLARATION OF JEAN-MARC ZIMMERMAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11 AND IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11 AND 28 U.S.C. § 1927**

**NOTE ON MOTION CALENDAR: JUNE 9, 2006**

I, Jean-Marc Zimmerman, do hereby state and declare the following in support of Plaintiff Eon-Net, L.P.'s ("Eon-Net" or "Plaintiff") Opposition to Defendant Flagstar Bancorp, Inc.'s ("Flagstar" or "Defendant") Motion for Sanctions Pursuant to Fed. R. Civ. P. 11 and in Support of Plaintiff's Cross-Motion for Sanctions Pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. §1927.

1

1.     I am an attorney-at-law licensed in the State of New Jersey and am counsel for Eon-Net in the above-identified action.

2.     Prior to filing the Complaint in this action I conducted a pre-suit investigation which included an examination of Flagstar's website located at www.flagstar.com (the "Flagstar Website") based on my understanding of certain Internet technologies more fully explained below in ¶¶3-7 of this Declaration.

3.     Web browser software, such as Internet Explorer and Mozilla Firefox, is used to view and interact with websites on the Internet.  An important aspect of such interaction is the ability of a visitor to a website to submit certain information to the website upon which the website may take action.  For example, a visitor to a website that sells books may submit to the website contact information, payment information and information identifying the particular book to be purchased and quantity desired.  The website receives and processes this information in order to complete a transaction with the visitor.  *See* Exhibit 1 attached hereto providing background materials relevant to ¶3 of this Declaration.

4.     When a computer user operating browser software ("Browser") accesses a website, a Hypertext Markup Language ("HTML") document, (or a document generated using a functionally equivalent technology), is typically displayed on the Browser's screen.  Certain of the pages on the website may include an HTML form element, or equivalent, that contains several fields (e.g., text, checkbox, drop down box) into which the Browser enters information to be received and processed by the website.  *See* Exhibit 2 attached hereto providing background materials relevant to ¶4 of this Declaration.

5.     For example, a shopping website typically includes a web page that contains a form element that requests that the Browser enter contact, credit card information and other purchase-related information.  The information to be entered is specified by an <input> tag that defines each type of information requested and associates a name with each field in the form into which a Browser enters a value.  When the customer hits a "submit" button associated with the form

2

element, the information submitted by the Browser, grouped as a series of name-value pairs, are extracted and submitted to a web server using one of a number of protocols including, for example, HTTP, S-HTTP, ftp, mailto, Java RPC, Adobe .pdf or XML.  *See* Exhibits 2 and 3 attached hereto providing background materials relevant to ¶5 of this Declaration.

6.     The receiving web server then typically calls a program, such as a CGI (Common Gateway Interface) script or a Java servlet, to further parse the sequence of name-value pairs to extract the specific customer information (e.g., name, address, credit card number, etc.) for further processing.  Depending on the particular information extracted, the script, for example, then transmits the extracted customer information to an application program to process the extracted information as required.  Each particular application program used may expect to see information passed to it in a particular format and using a particular protocol (e.g., HTTP, ftp, SMTP, Java RPC, Adobe .pdf, XML, comma-delimited, etc.).  *See* Exhibits 3 and 4 attached hereto providing background materials relevant to ¶6 of this Declaration.

7.     For example, if the extracted information is a customer's name, credit card number and expiration date, this information may be sent to an online payment processing application in a specific format using a secure protocol such as SSL or S-HTTP.  Alternatively, extracted purchase order information including a part number and a quantity ordered may be transmitted using ftp or mailto to a shopping cart application for processing the customer's order.  The format of the extracted information, therefore, is customized in order to meet the specific requirements of the particular application program that is to receive the extracted information.  *See* Exhibit 5 attached hereto providing background materials relevant to ¶7 of this Declaration.

8.     As part of my pre-suit investigation, I examined the home page and other pages on the Flagstar Website and observed that the Flagstar Website offers a variety of online services including online banking, cash management and online applications for credit cards, checking accounts, money markets, CDs, and loans.

ZIMMERMAN DECL. IN OPPOSITION TO FLAGSTAR'S RULE 11
MOTION

9.      I observed that Flagstar customers access these services by navigating their browser software to the particular web page on the Flagstar Website associated with the selected service. Once at the desired web page, the customer enters the requested information into a form element included in the web page. The entered information is then extracted and I reasonably concluded that the extracted information is transmitted to an appropriate application program residing on the Flagstar web server using a format and protocol required by the application program in order to perform the desired task associated with the particular online service.

10.      I also observed that the Flagstar Website offers a loan application service in which customers can apply online for a loan, such as a home equity loan. To apply for a loan, the customer provides certain information such as name, contact information, information about the customer's home, income, assets and debts. The customer enters this information into a several form elements contained in a series of web pages displayed in the customer's browser and this entered information is extracted and then transmitted to the Flagstar web server. The Flagstar web server then necessarily invokes a program that may further process the extracted information and then transmits the information to an application program that processes the loan application. I reasonably concluded that a portion of the extracted information is sent to an application program or programs to process the loan application, for example, an application program that checks the applicant's credit history with a credit bureau and an application program that makes a decision regarding the applicant's loan application. I reasonably concluded that the portion of the extracted information required by each application program is then transmitted using a format and protocol specified by such corresponding application program. Although I could not specifically identify the particular formats and protocols used to communicate with the various application programs because I was unable to inspect the actual lines of code used to operate the Flagstar Website, I reasonably concluded that the selection of formats and protocols was made to meet the requirements of the receiving application program.

11.      I further observed that the Flagstar Website contains more than twenty web pages in

4

which a customer enters information into a form element displayed in the customer's browser and the information extracted from that form is transmitted to a web server for further processing.

12.   As part of my pre-suit investigation, I construed the claim terms of U.S. Patent No. 6,683,697 ("the '697 Patent") patent according to the canons of claim construction that includes interpreting the patent claims in light of the specification and file history.  I also prepared a claim chart that compares the claim elements of the '697 patent to the corresponding portions of the Flagstar Website.  When preparing the claim chart, I copied the claim language from the version of the '697 Patent listed on the PTO website (www.uspto.gov) and didn't notice the PTO printing error in the claims.

13.   Shortly after filing this action in February 2005, I sent Flagstar a claim chart describing Plaintiff's infringement claims and a licensing letter that set forth Eon-Net's licensing schedule for the '697 Patent. True copies of the letter and claim chart are attached hereto as Exhibit 6. To date, neither Flagstar nor its attorneys have ever inquired about the substance of Eon-Net's infringement claim or asked for any clarification or additional information regarding Eon-Net's claim charts.

14.   Based on my investigation to date, I determined that the Flagstar Website uses software and technology from Digital Insight Corporation ("Digital Insight") to operate most, if not all, of the online banking services offered on the Flagstar Website.  My conclusion was based on reviewing several web pages on the Flagstar Website that explicitly reference Digital Insight, (*see* Exhibit 7 attached hereto, a true copy of web pages from the Flagstar Website that explicitly reference Digital Insight), and an SEC Form 424B4 filing made by Digital Insight on August 1, 2000, in which Digital Insight states that Flagstar Bank was one of its largest Internet banking customers for which it provides Internet banking services. *See* Exhibit 8 attached hereto, a true copy of a portion of Digital Insight's SEC filing.

15.   I reviewed Digital Insight's website www.digitalinsight.com and observed that Digital Insight provides financial institutions desiring an Internet presence an online banking

5

solution containing a comprehensive portfolio of Internet-based financial products and services that include "consumer and business Internet banking, online lending, electronic bill payment and presentment, check imaging, account-to-account transfers, website development and hosting." *See* Exhibit 9 attached hereto, a true copy of web pages from Digital Insight's website describing its online banking solutions.  Digital Insight provides these services using either its own application programs or application programs from third-party providers.  *See* Exhibit 8 and Exhibit 10 (a true copy of web pages from Digital Insight's website) attached hereto.

16.     I observed that one of the financial products offered by Digital Insight to its customers is a web-based service called AXIS Cash Management ("Cash Management").  *See* Exhibit 11 attached hereto, a true copy of a web page from Digital Insight's website describing Cash Management. Cash Management is a web-based application program that enables banking customers to check their accounts, monitor banking transactions, initiate wire transfers and perform other banking functions.  For example, to initiate a wire transfer, the customer enters wiring information into the fields in an Initiate Template displayed in the customer's browser and clicks the "initiate" icon to initiate the wire transfer. *See* Exhibit 12 attached hereto, a true copy of a Cash Management Initiate Template demo screen shot.  The wiring information is then extracted and communicated to a web server where it is further processed and transmitted to an application program in order to perform the wire transfer.

17.     I observed that the Flagstar Website offers Flagstar customers a cash management service using the Cash Management application program provided by Digital Insight. *See* Exhibit 7, p.2 attached hereto. *See also* Exhibit 13 attached hereto, a true copy of a Cash Management Initiate Template screen shot from the Flagstar Website.

18.     I also observed that Digital Insight offers a product called AnyTimeLender, described as "an Internet-based lending product that enables end users to apply for and receive loan decisions in real-time." *See* Exhibit 14 attached hereto, a true copy of a web page from Digital Insight's website describing AnyTimeLender.  The AnyTimeLender application supports a variety

of loan types including home equity, auto and other loan types and interfaces with credit bureaus and loan origination processing systems for managing the lending process. I observed that the Flagstar Website loan application service has similar functionality to the AnyTimeLender application provided by its vendor, Digital Insight.

19.     I also observed that in addition to the cash management service and the loan application service, Digital Insight offers an Internet banking application that provides online banking features such as bill payment, fund transfers and online statements. *See* Exhibit 15 attached hereto, a true copy of a web page from Digital Insight's website describing its Internet Banking application.  I observed that the Flagstar Website offers an online banking service that provides similar functionality to the Internet banking application provided by its vendor, Digital Insight.

20.     Based both on my review of documents and the Kofax Image Products' ("Kofax") website www.kofax.com detailed below in ¶¶21, 23-26 of this Declaration and communications I had with an attorney for Kofax that are detailed below in ¶¶27-39 of this Declaration, I concluded that Flagstar uses Kofax software to process loan and mortgage documents that have been converted to electronic format from hard copy documents using document scanners but not to perform the accused online banking services offered on the Flagstar Website.

21.     According to a December 16, 2004 press release from Kofax ("Press Release"), Flagstar uses Kofax's Ascent Capture software to process loan and mortgage documents that have been converted to electronic format using document scanners.  *See* Exhibit 16 attached hereto, a true copy of the Press Release.

22.     The Flagstar Bank Upgrade Agreement (*see* Affidavit of Jason B. Dufner, Exhibit 2 submitted in support of Flagstar's Rule 56 Motion) ("Upgrade Agreement") lists the existing Ascent licenses purchased by Flagstar from Kodak that include four licenses for 75,000 scans, two licenses for 25,000 scans and 13 unlimited scan licenses.  The Upgrade Agreement, therefore, confirms that Flagstar uses Ascent Capture to scan hard copy documents.

7

23.     According to a Kofax product brochure, Ascent for Payables, a Kofax product that Flagstar claims it uses, is used for capturing information contained in paper invoices that have been digitized using a document scanner.  *See* Exhibit 17 attached hereto, a true copy of an Ascent for Payables product brochure.

24.     According to a Kofax product brochure, INDICUS, another Kofax product Flagstar claims it uses, is used for automatically capturing unstructured data contained in paper documents such as claim forms, loan applications and correspondence.  *See* Exhibit 18 attached hereto, a true copy of an INDICUS product brochure.  The INDICUS product brochure explicitly references "mortgage processing" as one of the application areas served by INDICUS.

25.     Kofax markets a product called Ascent Capture Internet Server that enables hard copy documents to be scanned at remote locations and then communicated to a central location over the Internet.  *See* Exhibit 19 attached hereto, a true copy of an Ascent Capture Internet Server product brochure.

26.     The Kofax website does not list any Kofax products that perform the online services, such as online banking, cash management services and online applications for credit cards, checking accounts, money markets CDs and loans, that are offered on the Flagstar Website.

27.     On February 7, 2006, I received a letter from Mr. Paul L. Gale, an attorney for Kofax, asserting that Flagstar uses Kofax software and that Flagstar is therefore licensed under a license granted to Kofax by Millennium L.P. ("Kofax License"). Millennium L.P. is the owner of five predecessor patents to the '697 Patent.  A true copy of this letter is attached hereto as Exhibit 20.

28.     In order to verify whether Flagstar was in fact using Kofax software to perform the accused online banking services offered on the Flagstar Website, on February 7, 2006 I sent an e-mail to Mr. Gale asking him to identify "what Kofax product Flagstar is using and for what purpose such product is being used."  A true copy of this e-mail is attached hereto as Exhibit 21.

29.     On February 9, 2006, Mr. Gale sent me an e-mail stating that:

8

ZIMMERMAN DECL. IN OPPOSITION TO FLAGSTAR'S RULE 11
MOTION

"[a]s we understand the facts, Flagstar employs Kofax software products in connection with its e-mortgage business. Specifically, to the extent that Flagstar collects information over the internet and/or processes that information, Flagstar uses Kofax software products including, but not limited to, the Ascent Capture and Ascent for Payables products. As I am sure you will agree, the Settlement and License Agreement covers Flagstar's use of this technology."

A true copy of this e-mail is attached hereto as Exhibit 22.

30.     To further investigate whether or not Flagstar used Kofax software to perform the online banking services offered on the Flagstar Website, on February 10, 2006 I sent an e-mail to Mr. Gale asking:

"[o]ther than Flagstar's e-mortgage business, is Kofax software used for any other on-line banking services provided by  Flagstar?

What parts of the process of receiving information entered into HTML forms by users at Flagstar' website, extracting such information and transferring it to an application is performed by Kofax software?"

A true copy of this e-mail is attached hereto as Exhibit 23.

31.     Mr. Gale responded in an e-mail the same day that "I will try to find out the answers to your questions and get back to you."   A true copy of this e-mail is attached hereto as Exhibit 24.

32.     On February 14, 2006, I sent Mr. Gale an e-mail asking "[h]ave you heard back from your client regarding my questions."   A true copy of this e-mail is attached hereto as Exhibit 25.

33.     On February 16, 2006, Mr. Gale sent me an e-mail advising that "[w]e hope to have the information you requested by the close of business tomorrow." A true copy of this e-mail is attached hereto as Exhibit 26.

34.     On February 24, 2006, I sent Mr. Gale an e-mail inquiring "[f]urther to your e-mail of last Thursday, when can I expect to receive the information in question?"   A true copy of this e-mail is attached hereto as Exhibit 27.

35.     On February 27, 2006, Mr. Gale sent me an e-mail advising "I am still trying to track this down." On the same day, I sent Mr. Gale an e-mail asking "[d]o you know when you will

ZIMMERMAN DECL. IN OPPOSITION TO FLAGSTAR'S RULE 11 MOTION

have an answer?" Later that day, Mr. Gale sent me an e-mail responding "I'm hoping very shortly. The person who would know at Flagstar has been difficult to track down."  True copies of these e-mails are attached hereto as Exhibit 28.

36.     On March 1, 2006, I received an e-mail from Mr. Gale stating:

I have finally been able to gather the information you requested [on February 10, 2006].

I am advised that at Flagstar, Kofax software performs all processes related to (i) the receipt of all documents from Flagstar's website, (ii) the extraction of information from those documents, and (iii) the initial transfer of such information. **Because Flagstar's on-line banking functions do not include the receipt of documents from users of Flagstar's website, technology such as that provided by Kofax is not required in connection with those functions.** (emphasis added)

I trust that this answers your questions and that you will agree with me that the April 30, 2003 Settlement and License Agreement between Millennium and Kofax covers the products used by Flagstar."

A true copy of this e-mail is attached hereto as Exhibit 29.

37.     On March 3, 2006, I sent Mr. Gale an e-mail inquiring:

"[i]n your e-mail you say that "Kofax software performs all processes related to (i) the receipt of all documents from Flagstar's website." When you say "documents" do you mean hard copy documents that are imaged as opposed to electronic files that did not originate from a scanned hard copy document?"

A true copy of this e-mail is attached hereto as Exhibit 30.

38.     On March 15, 2006, Mr. Gale sent me an e-mail responding that:

"**I am told that the documents received through Flagstar's website are scanned hard copy documents**.  Flagstar's understanding, however, is that if electronic documents were to be received from Flagstar's website, Kofax technology could support the processing of those documents as well. (emphasis added)

A true copy of this e-mail is attached hereto as Exhibit 31.

39.     Even though Mr. Gale all but confirmed that Flagstar's use of Kofax software is limited to processing loan and mortgage documents that have been converted to electronic format using document scanners, I wanted to make sure that Kofax brand software was not used to provide

10

the accused online banking services offered on the Flagstar Wesbite.  Accordingly, on March 15,

2006, I sent Mr. Gale an e-mail asking:

> "[w]hat in fact is being used to process the HTTP requests received from customer browsers and invoke the various application programs that are used to service the request?"

Mr. Gale never responded to this e-mail from me.  A true copy of this e-mail is attached hereto as

Exhibit 32.

40.     On March 21, 2006, thirteen months after Plaintiff first filed this action in the

District of New Jersey, Ms. Melissa J. Baily, an attorney for Flagstar, sent me a letter claiming that

my questions regarding Flagstar's use of Kofax software somehow indicated a lack of pre-suit

investigation by Eon-Net, that Flagstar's infringing on-line activities are licensed under the Kofax

License, and also threatening to file a Rule 11 Motion if Plaintiff did not withdraw its Complaint.

A true copy of this letter is attached hereto as Exhibit 33.

41.     On March 22, 2006, I sent a letter to Ms. Baily in response pointing out that Mr.

Gale had still not sufficiently answered my questions regarding the scope of Flagstar's use of

Kofax software.  A true copy of this letter is attached hereto as Exhibit 34.

42.     On April 14, 2006, Flagstar served its Rule 11 Motion on me and indicated it would

file the same within 21 days if Plaintiff did not dismiss its Complaint.

43.     On April 17, 2006, I sent a letter to Ms. Baily asking:

> "please answer the following question: does Flagstar's website use Kofax software, and only Kofax software, to extract and process information from electronic files that do not originate from a scanned hard copy document."

A true copy of this letter is attached hereto as Exhibit 35.

44.     In response, in a letter dated April 18, 2006, Ms. Baily stated that "Flagstar's

website uses only Kofax software." A true copy of this letter is attached hereto as Exhibit 36.

45.     Because Ms. Baily's assertion contradicted Mr. Gale's statement that Kofax

software is not used to perform the online banking services offered on the Flagstar Wesbite and

also was at odds with the evidence that technology from Digital Insight is used to provide all, if not

ZIMMERMAN DECL. IN OPPOSITION TO FLAGSTAR'S RULE 11
MOTION

most, of the online banking services offered on the Flagstar Website, on April 19, 2006 I sent an e-mail to Ms. Baily with links to twenty-one different online services offered on the Flagstar Website including online banking, bill payment and cash management, and asked her to confirm whether such online services are performed using Kofax software and, if so, to identify the particular Kofax software.  A true copy of this e-mail is attached hereto as Exhibit 37.

46.     In a letter dated April 19, 2006, Ms. Baily responded by stating that Flagstar "would no longer informally assist Eon-Net" in its investigation of the Flagstar Website.  A true copy of this letter is attached hereto as Exhibit 38.  To date, Flagstar has not confirmed whether or not the online banking services on the Flagstar Website referenced by the twenty-one links are performed using Kofax software.

47.     In a letter to Ms. Baily dated April 21, 2006, I advised her that if Flagstar were to represent, and Kofax confirm, that Kofax software is used to perform the many different on-line banking functions offered to customers from its website, including the twenty-one links from Flagstar's web site that I provided to her, Plaintiff would willingly dismiss this action without delay. A true copy of this letter is attached hereto as Exhibit 39.  To date, Flagstar has not confirmed whether or not the online banking services on the Flagstar Website referenced by the twenty-one links are performed using Kofax software.

48.     In an e-mail to me dated April 24, 2006, Mr. Jon Steiger, an attorney for Flagstar, said that "you will pay substantial sanctions before this is over." A true copy of this e-mail is attached hereto as Exhibit 40.

I declare under the laws of the United States that the foregoing is true and correct.


/s/Jean-Marc Zimmerman
Jean-Marc Zimmerman


Date: June 5, 2006
        Westfield, New Jersey

12

ZIMMERMAN DECL. IN OPPOSITION TO FLAGSTAR'S RULE 11
MOTION